## J. R. KELLY ET AL v. BANK OF COMMERCE.

[57 South. 978.]

1. CORPORATIONS. *Sales of stock. Trust. Notes. Liability of maker.*
   In a suit against the guarantor of a promissory note given for the purchase of corporate stock it is no defense that the stock was purchased for another corporation, the corporation selling the stock having no knowledge of that fact; in such case, Ch. 88, Sec. 5, Laws of 1900 (Sec. 5005, Code of 1906) providing that "no corporation shall, directly or indirectly purchase or own the capital stock or any part thereof, of any other corporation," etc., having no application.

2. SAME.
   In such case where the purchaser signed his promissory note for the purchase price of the stock as "trustee" he is liable as a maker of the note, the word "trustee" not altering his individual liability.

APPEAL from the chancery court of Harrison county. HON. T. A. WOOD, Chancellor.

Bill by the Bank of Commerce against A. L. Thornton and others. From a decree for complainant, but dismissing the bill as to A. L. Thornton, defendant Kelly appeals and complainant prosecutes a cross-appeal.

On July 26, 1905, A. L. Thornton purchased from the Bank of Commerce eighty shares of stock for the sum of ten thousand dollars; certificates of stock being issued to "A. L. Thornton, trustee." In payment for said stock he gave a note to said bank for the sum of ten thousand dollars payable six months from date, with six per cent. interest, and deposited as collateral the certificate for said shares of stock. Said note was signed, "A. L. Thornton, Trustee." Thornton was the manager of the Union Bank & Trust Company, and it is the contention of the appellant Kelly that this stock in the Bank of Commerce was taken for the benefit of the Union Bank & Trust Company, in violation of the anti-trust statute of 1900, brought forward as Sec. 5005, Code 1906.

Afterwards, on December 7, 1905, said note being still unpaid, an agreement was entered into whereby said note was canceled and the stock certificates delivered to the Union Bank & Trust Company, upon Thornton's executing another note for ten thousand dollars, due six months from date, payment of which was to be guaranteed by J. R. Kelly, who indorsed the note. Contemporaneously with the execution of this note, the Union Bank & Trust Company, by A. L. Thornton, cashier, entered into an agreement with J. R. Kelly to sell Kelly certain described lands, "to be paid for in the following manner: one dollar cash and the payment of a certain note of date December 7, 1905, signed by A. L. Thornton, for the sum of ten thousand dollars," etc. This agreement also provided that the title to the land should be vested in one Tippin, as trustee, to be held by him until said note was paid by Kelly, and, in event he did not pay

same, said trustee was to sell the land and apply the proceeds to the payment of the note. The note was not paid at maturity, and Tippin, the trustee, sold the land for something less than four thousand dollars, and credited this amount on the note.

Thereafter the bank brought suit in the chancery court against Thornton and Kelly and the wife of the latter, to whom Kelly had conveyed certain lands in Harrison county. The bill prayed for a decree against Thornton and Kelly for the amount found to be due, and for a cancellation of the deed from Kelly to his wife, and that a lien should be fixed upon the land transferred by Kelly to his wife, and said land subjected to the payment of the balance on the note. The court found that Thornton was not liable on the note sued on, and dismissed the bill as to him, and entered judgment against Kelly and wife for the unpaid balance of the note, and canceled the conveyance from Kelly to his wife, and subjected the land attempted to be so conveyed to the payment of the amount adjudged against him, and granted Kelly and wife an appeal from this decree, and granted a cross-appeal to the Bank of Commerce against Thornton.

Kelly contended that the note sued upon represented an illegal transaction, void and unenforceable, because it was alleged to be made in violation of chapter 88, Sec. 5, Laws of 1900 (Sec. 5005, Code 1906), because Thornton purchased said stock for the Union Bank & Trust Company, and for the further reason that Kelly was not an absolute, but a conditional, guarantor for the payment of the note; his guaranty being limited by his agreement entered into at the time he indorsed the note.

*May & Sanders,* for appellants.

Sec. 5 of chapter 88, Laws of 1900, which was in force at the time of the execution of the writings furnishing the basis of this litigation, reads as follows:

"No corporation shall directly or indirectly purchase or own the capital stock, or any part thereof, of any other corporation, nor directly nor indirectly purchase, or in any manner acquire, the franchise, plant or equipments of any other corporation, if such other corporation be engaged in the same kind of business and be a competitior therein. Any corporation offending against this provision shall forfeit its charter, if a domestic corporation, and if a foreign corporation, shall forfeit its right to do business in this state and shall be proceeded against by the attorney general in manner and form provided by section 4 of this act."

In order to remove any controversy or doubt as to how the said law should be construed and applied, the legislature, out of an abundance of caution, closed the said chapter 88, laws of 1900, with section 11, which reads as follows:

"This act shall be liberally construed in all courts to the end that trusts and combines may be suppressed and the benefits arising from competition in business preserved to the people of this state."

We ground our argument on this phase of the case upon this postulate—any contract made in violation of the law of the land or in violation of its public policy as shown by the common law, the statutes or the decisions of the courts, is an illegal contract and imports no liability; and this is true whether the same be executed or executory or partly executed and partly executory.

In proceeding to demonstrate the soundness of this contention and to apply the same to the solution of this case, we maintain there is one fact which stands out as the naked truth, as shown by the record, and that is this—the sole and only consideration which ever moved from the Bank of Commerce as an inducement to the execution of the writings sued upon was the sale by it in violation of law, of eighty shares of its capital stock

to the Union Bank & Trust Company, another corporation engaged in the same kind of business and competing with it. We shall discuss the evidence sustaining this contention as we progress with the argument.

Assuming for the present the fact to be as stated, for the sake of argument, we call the court's attention to the leading case in Mississippi, *Deans* v. *McLendon,* 30 Miss. 343, in which, in an admirable and characteristically lucid opinion, Chief Justice Smith declares the rule to be as follows:

"It is not now to be controverted that no action can be maintained upon a contract the consideration of which is either immoral in itself or prohibited by law, or which is made in contravention of public policy. It is equally well settled that every contract that grows out of or is. in connection with an illegal or immoral act is absolutely void and will not be enforced in law or equity.

"Courts of justice in the observance of these rules are not influenced by any consideration of respect or tenderness for the party who insists upon the illegality of a contract; but exclusively by reasons of public policy. The object is to punish the active agent in the violation of a law, by withholding from him the anticipated fruits of his illegal act; and thus deterring all persons from violating its mandates, to give sancity to the law and security to the public."

The action in that case was instituted upon a note given for the purchase money of a slave which had been imported into the state without complying with the requirements of the law and, therefore, in violation of the law. The statute in that case imposed a penalty for the sale of such slaves, although it did not declare that the contract for the purchase money should be invalid, but the court held that that followed as a necessary consequence and they delivered themselves in the following language:

"The illegality and consequent invalidity of any contract made in direct violation of the provisions of this statute, is a question which admits of no debate."

And the rule thus laid down in *Deans* v. *McLendon, supra,* is cited with approval and reaffirmed in *Bohn* v. *Lowrey,* 77 Miss. 424. See also, 9 Cyc. 475.

In *Bank* v. *Owens et al.* (U. S.), 7 L. Ed. 508, which was a suit to recover on a note in which usurious interest was reserved contrary to the charter provisions of the bank which prohibited the charging of usurious interest, the court held the contract void and denied a recovery and, among other things, they say (p. 512) : "The question then is whether such contracts are void in law upon general principles. The answer would seem to be plain and obvious—that no court of justice can in its nature be made the handmaid of iniquity. Courts are instituted to carry into effect the laws of a country; how can they then become auxiliary to the consummation of violations of law?

To enumerate here all the instances and cases in which this reasoning has been practically applied would be to incur the imputation of vain parade. There can be no civil right where there can be no legal remedy; and there can be no legal remedy for that which is itself illegal."

No rights accrue from an unlawful contract. *Gibbs* v. *Consolidated Gas Co.* (U .S.), 32 L. Ed. 979.

The general rule is that courts will not aid parties to illegal contracts, which are executory only, to recover thereon; and where the contract is executed a court will not aid a *particeps criminis* in setting it aside. *Capehart* v. *Rankin,* 100 Am. Dec. 779.

Neither a court of law nor of equity will entertain the suit by either party to an illegal contract against the other when the contract is against public policy, whether it is executory or executed; and whenever a party seeking to recover is obliged to make out his case by show-

ing an illegal contract, or through the medium of such contract, or when it appears that he was privy thereto, he is not entitled to any expenditure made by him, in connection therewith or money due him as profits derived therefrom. *Woodson* v. *Hopkins,* 85 Miss. 171, 37 South. 1000, 107 Am. St. Rep. 275.

The case of *Woodson* v. *Hopkins, supra,* would seem to set at rest forever in Mississippi any distinction between contracts executory and contracts executed, where the consideration for the contract is illegal and the party seeking to recover is obliged to make out his case by showing such illegal contract or where he must proceed through the medium of such contract.

*J. L. Taylor & T. H. Barrett,* for appellee.

In answer to appellant's first argument, will say:

1. The Bank of Commerce did not know it was selling the stock to the Union Bank & Trust Company.

2. The evidence shows that the Union Bank & Trust Company was really and truly not a bank at all; no one ever saw a check given on it; of course it was not a bank.

3. As a matter of common knowledge and this court can see from the record the Union Bank & Trust Company was nothing in the world but A. L. Thornton and a clerk to assist A. L. Thornton in dodging taxation.

4. Even though the sale of the stock had been made by the Bank of Commerce to a competing corporation, yet Sec. 5005 of the Code of 1906 would not apply because the Bank of Commerce was the selling corporation which said statute does not prohibit buying stock and said statute is a penal statute, and penal statutes are strictly construed except as provided in section 5021 where it is expressly provided that this chapter should be liberally construed to the end and for the purpose of suppressing combines; not, however, to be construed liberally for the purpose of aiding the largest stockholder in a bank in defrauding said bank, or in aiding a director

of said bank in conspiring with the largest stockholder in a bank in defrauding the unsuspecting stockholders, which would be the effect if in this case the said Thornton, owning $10,000 worth of stock of the bank and the said J. R. Kelly who was a director (probably elected by the stock of his intimate friend Thornton)—if they are now allowed to take advantage of what they are pleased to term à violation of the law.

*Ford, White & Ford,* for cross-appellee.

The contract for the stock purchased was void because in contravention of the antitrust statute.

Section 5 of the antitrust statute of 1900 is as follows:

"Section 5.  No corporation shall directly or indirectly purchase or own the capital stock, or any part thereof, of any other corporation, nor directly or indirectly purchase, or in any manner acquire the franchise, plant or equipments of any other corporation, if such other corporation be engaged in the same kind of business, and be a competitor therein.  Any corporation offending against this provision shall forfeit its charter, if a domestic corporation, and if a foreign corporation, shall forfeit its right to do business in this state, and shall be proceeded against by the attorney-general in manner and form provided in section 4 of this act."

Section 3 of said act renders all contracts in violation of it void.  The testimony does not show that Tomlinson and Tippin did not know for whom Thornton was trustee in the purchase of the stock from the bank; but even if their ignorance of this fact could, under any circumstances, make valid an otherwise void contract, the testimony leaves little room to doubt that they either knew for whom he was trustee, or were intentionally and purposely ignorant of the fact in order to give validity to the transaction.

It is true that Tomlinson on his redirect examination, in response to carefully worded questions from the

bank's attorney, denied that he knew that Thornton pur-chased the stock for the Union Bank & Trust Company; and it is also true that after having testified on Decem-ber 29, when he was recalled to the witness stand on January 6 for cross-examination by counsel for cross-appellee Thornton, his mind had become a perfect blank so far as any knowledge as to whom Thornton repre-sented in the purchase of the stock of the Bank of Commerce was concerned. But, unfortunately for cross-appellant, before this witness became aware of the dan-ger of that testimony, he repeatedly admitted that the Union Bank & Trust Company bought this stock and re-peatedly testified to that fact.

Mayes, C. J., delivered the opinion of the court.

We have given to this record most careful examina-tion. It is our judgment that the court made but one error, and that consists in not giving judgment against Thornton also. The trial court settled the facts, and was fully justified in the conclusion both that the Union Bank & Trust Company was not the purchaser of the stock, and that, if this is not the true state of facts, then the Bank of Commerce had no knowledge that the Union Bank & Trust Company was the purchaser, if in truth it was. This being the case, Sec. 5005 of the Code of 1906, providing that "no corporation shall, directly or indirectly, purchase or own the capital stock, or any part thereof, of any other corporation, nor directly or indi-rectly purchase, or in any manner acquire, the fran-chise," etc., is not involved under the facts.

The decree of the chancellor is correct in all save the dismissal of the suit against Thornton.

On direct appeal the case must be affirmed, and on cross-appeal reversed and remanded.

*Affirmed on direct appeal.*

*Reversed and remanded on cross-appeal.*